```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
SECURITIES INVESTOR PROTECTION          :
CORPORATION,                            :
                                        :
                    Plaintiff,          :
                                        :    12 Civ. 1039 (DLC)
            v.                          :
                                        :
JACQUELINE GREEN ROLLOVER ACCOUNT, et   :
al.                                     :
                                        :
                    Movants.            :
----------------------------------------X
SECURITIES INVESTOR PROTECTION          :
CORPORATION,                            :
                                        :
                    Plaintiff,          :    12 Civ. 1139 (DLC)
                                        :
            v.                          :
                                        :    OPINION & ORDER
I.B.E.W. LOCAL 241 PENSION FUND, et al. :
                                        :
                    Movants.            :
---------------------------------------- X
IN RE BERNARD L. MADOFF INVESTMENT      :
SECURITIES, LLC,                        :
                                        :
                    Debtor.             :
----------------------------------------X
```

APPEARANCES

For the Construction Plan Claimants:

Jennifer A. Clark
Jonathan M. Cerrito
Brian J. LaClair
Blitman & King LLP
443 North Franklin Street
Syracuse, NY 13204-5412

For Jacqueline Green Rollover Account and Wayne Green Rollover
Account:

Helen Davis Chaitman

45 Broadway
New York, NY 10006

For J.X. Reynolds & Co. Deferred Profit Sharing Plan:

Helen Davis Chaitman
45 Broadway
New York, NY 10006

For Orthopaedic Specialty Group, P.C. Defined Contribution
Pension Plan Participants:

Peter N. Wang
Foley & Larner LLP
90 Park Ave.
New York, NY 10016

Marc J. Kurzman
Sandak Hennessey & Greco, LLP
707 Summer St., 3rd Floor
Stamford, CT 06901

For Eric Saretsky & The Plan Administrator of the Sterling
Equities Associates Employee Retirement Plan:

Myron D. Rumeld
Anthony S. Cacace
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036

For Upstate New York Bakery Drivers and Industry Pension Fund:

Mark I. Silberblatt
Bisceglie & Demarco, LLC
365 Rifle Camp Road
Woodland Park, NJ 07424 and
711 Third Ave., Suite 1803
New York, NY 10017

For Steven H. Fisch:

Steven H. Fisch, pro se
79 Princeton Road
Chestnut Hill, MA 02467

For Paul J. Fisch and Deborah L. Fisch

Paul J. Fisch and Deborah L. Fisch, pro se
5111 Coffee Tree Lane
North Syracuse, NY 13212

For Irving H. Pickard:

David J. Sheehan
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111

For the Securities Investor Protection Corporation:

Josephine Wang
Kevin H. Bell
Christopher H. Larosa
Securities Investor Protection Corporation
805 Fifteenth St., N.W., Suite 800
Washington, DC 20005


DENISE COTE, District Judge:

       Irving H. Pickard, trustee (the "Trustee") for the
substantively consolidated liquidation of Bernard L. Madoff
Investment Securities LLC ("BLMIS") and the estate of Bernard L.
Madoff ("Madoff"), has submitted a motion (the "ERISA Motion")
for an order affirming the Trustee's determinations denying
claims over ERISA-related objections filed by claimants (the
"ERISA Claimants") who argue that the Employee Retirement Income
Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., and
related regulations confer on them "customer" status, as that
term is defined by Section 78lll(2) of the Securities Investor

Protection Act of 1970 ("SIPA") as amended, 15 U.S.C. §§ 78aaa-78lll.  For the following reasons, the motion is granted.

BACKGROUND

Many of the basic facts in this matter were addressed in the Court's January 4, 2012 Opinion and Order in the related case In re Aozora Bank Ltd., 11 Civ. 5683 (DLC), 2012 WL 28468 (S.D.N.Y. Jan. 4, 2012) (the "January Opinion" or "Aozora").  They are recounted below as a convenience, along with additional facts relevant to the disposition of this matter.

The ERISA Claimants fall into two categories.  One category consists of individuals (the "Individual Claimants") who claim that they participated in ERISA-regulated retirement plans that had accounts with BLMIS.[1]  The other category consists of

---

[1] The Individual Claimants include Eric S. Saretsky and the Sterling Plan Administrator, purporting to speak on behalf of Eric S. Saretsky individually and on behalf of all the other Sterling Equities Associates Employees Retirement Plan participants (the "Sterling Individual Claimants"); 117 claim-filing participants in the Orthopaedic Specialty Group P.C. Defined Contribution Pension Plan (the "Orthopaedic Individual Claimants"); and the Jacqueline Green Rollover Account and the Wayne D. Green Rollover Account (collectively, the "Green Individual Claimants"), who allegedly invested though the WDG Associates Inc. Retirement Trust ("WDG Trust").  The Sterling Equities Associates Employees Retirement Plan (the "Sterling Plan") offered participants a number of investment options other than putting their money into BLMIS, but the majority of their investments nonetheless went to BLMIS.  The Orthopaedic Specialty Group P.C. Defined Contribution Pension Plan (the "Orthopaedic Plan") did not offer participants alternate investment options, and almost all of its money went into its

4

entities that claim to be ERISA-regulated plans or individual
retirement accounts ("IRAs") that invested directly or
indirectly in a BLMIS account-holder entity such as a hedge fund
or trust (the "Plan Claimants").[2]  None of the claimants in
either category had their own accounts with BLMIS.

BLMIS did not in fact invest the assets entrusted to it.
Instead, Madoff, the sole member and principal of BLMIS, stole
these assets as part of a multi-billion dollar Ponzi scheme.

---

BLMIS account.  The Green Individual Claimants do not specify
whether the WDG Trust is a defined contribution plan or a
participant directed plan.  The Sterling Plan, the Orthopaedic
Plan, and the WDG Trust each submitted its own customer claim
covering all of the money allegedly in its BLMIS account.

[2] The Plan Claimants include J.X. Reynolds & Co., Deferred Profit
Sharing Plan (the "Reynolds Plan"), which invested in BLMIS
account-holder The Petito Investment Group ("Petito"),
apparently a general partnership with the Reynolds Plan as one
of its partners; Ltd. Editions Media, Inc. Defined Benefit
Pension Plan UA Dtd. 2/9/99, Claimant ("Ltd. Ed. Plan"), which
purchased a limited partnership interest in BLMIS account-holder
Fairfield Sentry Limited ("Fairfield"), a Feeder Fund
incorporated in the British Virgin Islands that was a subject of
the January Opinion; Upstate New York Drivers and Industry
Pension Fund ("Upstate NY Plan"), which invested in Income Plus
Investment Fund ("Income Plus"), a formal trust managed by
Jeanneret Associates; a group of 37 plans (collectively, the
"Construction Plans") that invested in BLMIS account-holders
Income Plus, Andover Associates LLC I ("Andover"), a New York
limited liability company, and Beacon Associates LLC I ("Beacon
I"), a New York limited liability company, as well as Beacon
Associates LLC II ("Beacon II"), also a New York limited company
which invested mostly or exclusively in Beacon I and did not
hold a BLMIS account; Howard Siegel, on behalf of the Howard
Siegel IRA ("Siegel"), who claims that he invested in Beacon II;
and Paul and Deborah Fisch, Michael Fisch, and Steven Fisch (the
"Fisch Claimants"), who claim to have invested 401k funds in the
BLMIS account-holder P J F N Investors L P ("PJFN").

Madoff was arrested and charged with securities fraud on December 11, 2008.  On December 15, 2008, the United States District Court for the Southern District of New York entered an order placing BLMIS's customers under the protections of SIPA.

SIPA provides certain benefits to customers of failed brokerage firms.  In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 233 (2d Cir. 2011).  During a SIPA liquidation, customers share in the recovery of "customer property," which generally consists of the cash and securities held by the liquidating broker-dealer for customers, on the basis of their respective "net equities" and to the exclusion of the brokerage firm's general creditors.  15 U.S.C. §§ 78fff-2(b) and (c)(1); In re New Times Sec. Servs., Inc., 463 F.3d 125, 128-29 (2d Cir. 2006).  Where customer property is insufficient to satisfy the claims of customers, SIPA permits the Securities Investor Protection Corporation ("SIPC") to make advances to the SIPC trustee, within the statutory limits of protection from the SIPC Fund.  For customers with securities accounts, SIPC may advance not more than $500,000 per customer.  15 U.S.C. §§ 78ddd, 78fff3(a); In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d at 233.

On June 11, 2010, the Trustee filed a motion for an order to affirm the Trustee's determinations denying the claims of claimants without BLMIS accounts in their names, namely,

investors in so-called Feeder Funds (the "Feeder Funds Motion").
The sixteen Feeder Funds were essentially hedge funds structured
as limited partnerships, a limited liability company, and other
commercial entities that had accounts with and invested directly
with BLMIS.

On June 28, 2011, the Bankruptcy Court issued an order
affirming the Trustee's denial of these "customer" claims,
concluding that the Feeder Funds themselves, not the objecting
claimants who invested in the Feeder Funds, qualified as
customers under SIPA.  See Sec. Investor Prot. Corp. v. Bernard
L. Madoff Inv. Sec. LLC, 454 B.R. 285, 290 (Bankr. S.D.N.Y.
2011).  This Court affirmed the Bankruptcy Court's decision in
the January Opinion.  See Aozora, 2012 WL 28468, at *1.  The
briefing on the Feeder Fund Motion did not address the question
of the impact of ERISA on the determination of "customer" status
under SIPA.

On October 5, 2011, the Trustee filed the ERISA Motion
before the Bankruptcy Court.  In the ERISA Motion, the Trustee
sought an order: 1) affirming the Trustee's denial of the ERISA
Claimants' claims, and 2) overruling the objections to the
Trustee's interpretation of the term "customer" on the basis of
ERISA and related regulations.  On November 8, 2011, the
Bankruptcy Court entered a Scheduling Order (the "Bankruptcy
Court Scheduling Order") setting a schedule for briefing on the

ERISA Motion, and indicating that any objections or arguments raised by the ERISA Claimants that are unrelated to ERISA would be resolved at a later date.

The Reynolds Plan and the Greens moved for withdrawal of the reference to the Bankruptcy Court in the above-captioned case number 12 Civ. 1039 on February 9, 2012, and the Construction Plans moved for withdrawal of the reference in the above-captioned case number 12 Civ. 1139 on February 14.  On April 20, 2012, the ERISA Motion became fully submitted before the Bankruptcy Court.  Also on April 20, this Court issued an order (the "April 20 Order") withdrawing the reference from the Bankruptcy Court with respect to the ERISA Motion.  On April 26, the Court ordered that the briefing materials on the ERISA Motion that had been submitted to the Bankruptcy Court be resubmitted to the Court with the correct caption by May 18, 2012.

On May 25 counsel for the Reynolds Plan submitted a supplemental declaration in opposition to the ERISA Motion.  By Order of June 5, the Court authorized supplemental briefing on the ERISA Motion.  On June 14, counsel for the Greens submitted supplemental briefing on the motion.  The Trustee and SIPC responded on June 28.  Although the Court had not authorized a reply, the Greens submitted one on July 12.

DISCUSSION

At issue in this motion is the impact of ERISA on the customer status of indirect investors who did not themselves hold BLMIS accounts, but who had an interest in third-party entities that <u>did</u> hold BLMIS accounts.

I.   The January Opinion

The January Opinion determined that indirect investors who invested in certain third-party corporate entities -- i.e., the Feeder Funds -- did not qualify as customers under SIPA because, <u>inter alia</u>, they did not hold BLMIS accounts and they did not have an ownership interest in the assets invested with BLMIS. <u>See</u> <u>Aozora</u>, 2012 WL 28468, at *5-6.  In short, the January Opinion determined that the corporate form was not to be overlooked in determining customer status under SIPA.  Even if nearly all of the assets that a claimant invested in a Feeder Fund eventually ended up entrusted to the debtor, the claimant was not a customer if these assets belonged to a Feeder Fund and if the name on the debtor's account was that of a Feeder Fund. <u>See</u> <u>id.</u>

The claimants in this case are similarly situated to those in the January Opinion.  They are indirect investors who invested in a BLMIS account-holder.  In fact, at least one Plan Claimant, the Ltd. Ed. Plan, invested in the same Feeder Fund as did certain claimants in the January Opinion.

9

Unlike the claimants in <u>Aozora</u>, however, the claimants in these actions allege either that they invested in an ERISA-regulated plan, or that they are ERISA-regulated plans themselves.[3]  They argue that pursuant to an appropriate application of ERISA law, they must be granted customer status under SIPA.  This Opinion addresses whether this proposition is correct, and concludes that it is not.

II.  Scope of this Opinion

Pursuant to the Bankruptcy Court Scheduling Order, briefing on this motion was to be limited to issues arising under ERISA. Accordingly, the claimants' briefing in support of the motions to withdraw the bankruptcy reference of February 9 and February 14 argued that the ERISA Motion involved significant and novel interpretations of SIPA and ERISA.  The motions to withdraw the reference were granted partly on these grounds.  The scope of this Opinion is therefore limited to the question of whether ERISA has any bearing on the ERISA Claimants' "customer" status under SIPA.  Factual or legal arguments unrelated to issues arising under ERISA will not be addressed, and are left to be resolved by the Bankruptcy Court.

Thus, although the Trustee avers that certain claimants have failed to establish that ERISA applies to them, it will be

---

[3] Some claimants do not state unambiguously that they fall into one of these categories, but still make arguments based on ERISA.

assumed for purposes of this motion that ERISA applies to all claimants.  In addition, the supplemental briefings submitted by the Reynolds Plan and the Greens on May 25 and June 15, respectively, purport to present evidence that these claimants had contact with BLMIS, that BLMIS traded in securities for their accounts, or that they were known to BLMIS.  They do not present any arguments based on ERISA, or cite to any ERISA provision or accompanying regulation.  These arguments are therefore beyond the scope of the ERISA Motion and will not be addressed in this Opinion.  Following the disposition of this motion, the Bankruptcy Court may address the impact, if any, of the supplemental materials submitted by the Reynolds Plan and the Greens on their "customer" status.

III. Customer Status Under SIPA

SIPA's principal purpose is "to protect investors against financial losses arising from the insolvency of their brokers." In re New Times, 463 F.3d at 127 (citation omitted).  "Customer" is a term of art, however, Arford v. Miller, 239 B.R. 698, 701 (S.D.N.Y. 1999) aff'd sub nom. In re Stratton Oakmont, 210 F.3d 420 (2d Cir. 2000), and "[j]udicial interpretations of 'customer' status support a narrow interpretation of SIPA's provisions."  In re New Times, 463 F.3d at 127 (citation omitted); cf. S.E.C. v. F.O. Baroff Company, Inc., 497 F.2d 280, 282 (2d Cir. 1974) (declining to apply the "literal definition"

of the term customer because SIPA "was not designed to protect a
lender in appellant's class").  A person may be a customer with
respect to some of his claims but not others.  See id. at 282
n.2.  In the Second Circuit, "[e]mphasis on the customer as
investor and purchaser/trader has been a consistent theme."
Investor Protection v. Morgan, Kennedy & Co., 533 F.2d 1314,
1317 (2d Cir. 1976) ("Morgan, Kennedy").  Overall, however, "the
critical aspect of the 'customer' definition is the entrustment
of cash or securities to the broker-dealer for the purposes of
trading securities."  In re Bernard L. Madoff Inv. Sec. LLC, 654
F.3d at 236 (citation and emphasis omitted).

A.   The Statutory Language

     SIPA contains three statutory definitions of the term
"customer."  It defines the term as follows:

>     any person (including any person with whom the debtor
>     deals as principal or agent) who has a claim on
>     account of securities received, acquired, or held by
>     the debtor in the ordinary course of its business as a
>     broker or dealer from or for the securities accounts
>     of such person for safekeeping, with a view to sale,
>     to cover consummated sales, pursuant to purchases, as
>     collateral security, or for purposes of effecting
>     transfer.  The term 'customer' includes any person who
>     has a claim against the debtor arising out of sales or
>     conversions of such securities, and any person who has
>     deposited cash with the debtor for the purpose of
>     purchasing securities.

15 U.S.C. § 78lll(2).  The first of the three alternative
definitions is contained in the first sentence of this passage.
The remaining two definitions are contained in the second

12

sentence, which clarifies that the term includes persons with claims arising out of sales of "such securities," and persons who have deposited cash with the debtor.

The ERISA Claimants concede that they do not qualify for customer status under the first two definitions of customer in SIPA § 78lll(2).  This is because these definitions presume that a customer must have a securities account with the debtor.  See Aozora, 2012 WL 28468, at *4-6 (interpreting the first two definitions of SIPA § 78lll(2)).  The ERISA claimants had no such accounts.

The ERISA Claimants argue, however, that they fit within SIPA's third definition of customer because they "deposited cash with the debtor for the purpose of purchasing securities."  15 U.S.C. § 78lll(2).  The ERISA Claimants are mistaken.

One cannot deposit cash with the debtor if this cash belongs to another.  See Aozora, 2012 WL 28468, at *6; In re Primeline Sec. Corp., 295 F.3d 1100, 1107 (10th Cir. 2002) ("The relevant inquiry is whether the brokerage firm actually received, acquired or possessed Claimants' property."); In re Old Naples Sec., Inc., 223 F.3d 1296, 1302 (11th Cir. 2000) (whether a claimant "deposited cash with the debtor" depends on "whether there was actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation") (citation omitted); Sec. Inv. Prot. Corp., 454

B.R. at 298-99 (claimants could not have entrusted cash with BLMIS for the purpose of trading or investing in securities because this property belonged to the Feeder Funds).  None of the ERISA Plan Claimants owned any cash deposited with BLMIS. Rather, for the reasons discussed below, in each case this cash was owned by the third-party entity in which the claimant invested, and which had a BLMIS account in its name (the "Account-Holder Entity").

  i.   The Individual Claimants' Ownership Interests

  The Individual Claimants did not own any cash deposited with BLMIS because the assets of an ERISA-regulated plan are held and owned by the plan's trustees, not by its participants. Binding precedent and ERISA itself dictate this result.  The Second Circuit has explained the law on this point as follows:

> [A]ll of [an ERISA-regulated] Plan's undistributed assets are legally owned by the trustee and managed for the benefit of all plan participants, with gains and losses shared by them on a pro rata basis.  A single participant's "account" is merely a bookkeeping entry that is used at the time of his retirement to determine what benefits he is entitled to receive.

Milgram v. Orthopedic Associates Defined Contribution Pension Plan, 666 F.3d 68, 74 (2d Cir. 2011).  See also 29 U.S.C. § 1103(a) ("[A]ll assets of an employee benefit plan shall be held in trust by one or more trustees."); LaRue v. DeWolff, Boberg & Associates, Inc., 552 U.S. 248, 262 (2008) (Thomas, J., concurring) ("ERISA requires a plan's combined assets to be held

14

in trust and legally owned by the plan trustees.").  The Individual Claimants offer no meaningful distinction between the assets at issue in Milgram and those deposited with BLMIS at issue here.

The Individual Claimants make a variety of specious arguments in an effort to escape this binding precedent.  The Orthopaedic Individual Claimants claim that they have a "permanent, nonforfeitable right" to amounts under their plan and that they will have a cognizable interest in these amounts at the time their benefits vest.  None of this changes the fact that the Orthopaedic plan, like the plan in Milgram, is a defined benefits plan governed by 26 U.S.C. 401(k)(2).  Under Milgram, the undistributed assets of such a plan are legally owned by its trustee, not its participants.  See Milgram, 666 F.3d at 74.

The Orthopaedic Individual Claimants argue that the provision of Larue cited above is dicta and contrary to language in ERISA that defines the terms "individual account plan" and "defined contribution plan."  29 U.S.C. § 18, 1002(34).  Nothing in this provision of ERISA, however, addresses the ownership rights of plan participants in the assets of an ERISA plan.  If Justice Thomas's concurrence in Larue consists of dicta, it is nonetheless well-considered dicta, the substance of which has been confirmed by the Second Circuit in Milgram.

15

The Green Individual Claimants allege, without support, that they had an ownership interest in assets held by their plan because these funds were trust funds.  The Sterling Individual Claimants make a similar claim.  As discussed above, this claim is contrary to the language of Milgram, Larue, and even the very provision of ERISA cited by the Green Individual Claimants, 29 U.S.C. § 1103(a), according to which title to the assets of a trust established pursuant to ERISA is held by the trustee.  See 29 U.S.C. § 1103(a); Larue, 552 U.S. at 262-63 & n.*; Milgram, 666 F.3d at 74.

A number of claimants argue that Milgram and Larue reflect a shift in the landscape of ERISA law towards protecting the rights of individual participants, and that this Court should therefore grant them "customer" status notwithstanding the passages from these opinions quoted above.  The claimants note that earlier precedent, such as Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134 (1985), limited plan participants' right to seek recovery of losses from their investments directly.  Larue and Milgram expanded participants' rights by allowing them to bring such actions on behalf of a plan.  See LaRue, 552 U.S. at 250; Milgram, 666 F.3d at 69-70.  In light of this expansion of the rights of individual ERISA-plan participants, the claimants argue that a similar expansion of SIPA's "customer" definition is appropriate.

This argument ignores the distinction between fiduciary obligations and ownership rights.  The instant Opinion addresses claimants' "customer" status under SIPA, not their right to seek recovery for their losses from a fiduciary through a private lawsuit.  Claimants' customer status, in turn, hinges substantially on their ownership rights in assets invested with BLMIS.  In no uncertain terms, both Milgram and Larue declare these rights to be nonexistent.

ii.  The Plan Claimants' Ownership Interests

The Plan Claimants did not own any cash deposited with BLMIS because, like the claimants in the Feeder Fund Motion, the Plan Claimants directly or indirectly invested in, and not through, independent third-party entities.  These entities consisted of a general partnership organized under New York law, a "group trust" established pursuant to the Internal Revenue Service's Revenue Ruling 81-100, Rev. Rul. 81-100, 1981-1 C.B. 326 (1981), a company organized in the British Virgin Islands ("BVI"), and LLCs established under New York law.

The relevant black letter law with respect to each of these types of entities provides no ownership rights to the claimants.  Under New York law, a general partner's interest as a partner "grants no individually exercisable rights to the partner."  Matter of Minton Group, Inc., 46 B.R. 222, 224 (Bankr. S.D.N.Y. 1985).  A general partner "has no personal right in any specific

17

partnership property."  Id. (citation omitted).  Likewise, the
"common law of trusts" governs trusts created pursuant to ERISA,
see Central States, Southeast and Southwest Areas Pension Fund
v. Central Transport, Inc., 472 U.S. 559, 570 (1985); Rev. Rul.
81-100, 1981-1 C.B. 326 (1981) (a group trust created pursuant
to the ruling must be "maintained at all times as a domestic
trust in the United States"), and dictates that it is the
trustee not the trust beneficiaries who holds title to trust
property.  See Austin Wakeman Scott, 2A The Law of Trusts §
265.4 (4th ed. 1988) ("From the traditional point of view, it
would seem that the trustee is the legal owner of trust
property."); George Gleason Bogert, George Taylor Bogert, Amy
Morris Hess, The Law Of Trusts And Trustees § 141 ("It is
sometimes stated that the transfer by the settlor of a legal
title to the trustee is an essential to the creation of an
express trust.").  The same principle applies under New York law
and under ERISA itself.  See, e.g., In re Suprema Specialties,
Inc., 370 B.R. 517, 530 (S.D.N.Y. 2007) (Under New York law,
creation of an express trust requires "actual delivery or
assignment of the trust res with the intent of vesting legal
title with the trustee."); 29 U.S.C. § 1103(a) (title to trust
established pursuant to ERISA held by trustee); see also In re
J.P. Jeanneret Associates, Inc., 769 F. Supp. 2d 340, 370
(S.D.N.Y. 2011) (plans investing in Income Plus required to sue

derivatively to recover money lost by Income Plus to Madoff).
Similarly, under the common law of the United Kingdom,
applicable to the BVI, "[a] company's property belongs to the
company and not to its shareholders." Johnson v. Gore Wood &
Co., [2002] 99 Me. 26, 58 A. 64, 2 A.C. 1, 40 (Dec. 14, 2011),
[2001] B.C.C. 820, 858 (H.L.).  And with respect to an LLC
established under New York law, an LLC member has no interest in
any of the LLC's assets.  See N.Y. Ltd. Liab. Co. Law § 601
(McKinney 2011).

The offering memoranda and operating agreements for each of
these third-party entities confirm that the claimants had no
ownership interest in the entity's assets.  Each such memorandum
or agreement indicates that the parties intended the entity to
hold title to fund assets, and/or refers repeatedly to the
assets being held by the entity as assets of the entity itself,
not of its members, beneficiaries, or investors.

a.    The "Plan Assets" Regulation

The Plan Claimants argue that they had an ownership
interest in the assets invested with BLMIS pursuant to a
particular provision of ERISA that defines the term "plan
assets," as well as the regulations accompanying this
definition.  The Plan Claimants submit that, since they owned
these assets, they "deposited cash with" BLMIS and are therefore
BLMIS customers.

19

The "plan assets" section of ERISA reads as follows:

> <u>For purposes of this subchapter</u> . . . the term "plan assets" means plan assets as defined by such regulations as the Secretary may prescribe, except that under such regulations the assets of any entity shall not be treated as plan assets if, immediately after the most recent acquisition of any equity interest in the entity, less than 25 percent of the total value of each class of equity interest in the entity is held by benefit plan investors.

29 U.S.C. § 1002 (emphasis supplied).  The referenced "subchapter" is Subchapter I, "Protection of Employee Benefit Rights," which covers what is known as ERISA Title I, codified at 29 U.S.C. § 1001-1191(c), consisting of Subtitle A and B.

The relevant Department of Labor ("DOL") regulations further define the term "plan assets."  The regulation reads, in pertinent part:

> (a) In general.
>
>> (1) This section describes what constitute assets of a plan with respect to a plan's investment in another entity <u>for purposes of subtitle A, and parts 1 and 4 of subtitle B, of title I of the Act and section 4975 of the Internal Revenue Code</u>. . . .
>
>> (2) Generally, when a plan invests in another entity, the plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, in the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940 its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that—

>       (i) The entity is an operating company, or
>
>       (ii) Equity participation in the entity by
>       benefit plan investors is not significant. . . .
>
> (f) Participation by benefit plan investors.
>
>       (1) Equity participation in an entity by benefit
>       plan investors is "significant" on any date if,
>       immediately after the most recent acquisition of any
>       equity interest in the entity, 25 percent or more of
>       the value of any class of equity interests in the
>       entity is held by benefit plan investors.

29 C.F.R. § 2510.3-101 (emphasis supplied).

The Plan Claimants argue that the assets invested with BLMIS by the Account-Holder Entities constituted "plan assets" under the terms of this regulation.  In other words, the Plan Claimants allege that they took equity interests in the Account-Holder Entities, that these entities were not operating companies, and that equity participation by ERISA benefit plan investors in the Account-Holder Entities was "significant" -- i.e. 25% or more of the value of a class of equity interests in the entity was held by ERISA plan investors.

Even if the Plan Claimants are correct that the Account-Holder Entities' assets qualify as "plan assets," this does not by itself confer upon the Plan Claimants an ownership interest in the assets in question.  By its own terms, ERISA limits application of its definition of "plan assets" to a portion of ERISA, and the Secretary's regulations circumscribe its applicability even further.  Neither ERISA nor the regulations

purport to affect ownership of property as a matter of general commercial law.[4]

ERISA grants the Secretary of Labor authority to promulgate regulations defining the meaning of the term "plan assets," but limits application of the definition to ERISA Title I.  See 29 U.S.C. § 1002.  The Secretary's regulations further delimit application of the plan asset regulation to subtitle A, and parts 1 and 4 of subtitle B, of title I of the Act and Section 4975 of the Internal Revenue Code.  See 29 C.F.R. § 2510.3-101. None of these sections of ERISA or the Internal Revenue Code alter general commercial property rights; their scope is far more limited.  Subtitle A of ERISA, 29 U.S.C. §§ 1001-1003, is entitled "General Provisions" and contains definitions of terms applicable to ERISA, and provisions about the intended scope and purpose of ERISA.  Subtitle B is entitled "Regulatory Provisions," and Part 1 of Subtitle B, "Reporting and Disclosure," 29 U.S.C. §§ 1021-1031, sets out reporting

---

[4] Moreover, even if the plan asset regulation were to alter the Plan Claimants' property rights for purposes of determining their customer status under SIPA, ERISA contains a subordination provision pursuant to which nothing in ERISA is to "alter, amend, modify, impair, or supersede any law of the United States." 29 USC § 1144(d).  Thus, in order to prevail on this issue, the Plan Claimants would need to show that applying ERISA in the manner they propose would not impair the functioning of SIPA's scheme for distributing advances to customers of the debtor.  This could prove challenging if, for example, the Plan Claimants' scheme would require that SIPC treat both the Plan Claimants and the Account-Holder Entities in which they invested as customers.

requirements applicable to pension plans.  Part 4 of Subtitle B, "Fiduciary Responsibility," defines the scope and nature of fiduciary responsibility in relation to employee benefit plans and their assets.  Section 4975 of the Internal Revenue Code, 26 U.S.C. §4975, imposes a tax on certain forms of prohibited transactions involving employee benefit plans.  The parties cite to no case or DOL advisory opinion that applies the plan assets regulation outside the context of the subchapters identified in the regulation itself.

These observations are consistent with the DOL's own writings on the plan assets regulation.  The DOL document promulgating the plan assets regulation clarifies that the regulation was intended to delineate the scope of investment managers' fiduciary duties.  It states:

> The proposed plan assets regulation described the circumstances under which the assets of an entity in which a plan invests will be considered to include "plan assets" so that the manager of the entity would be subject to the fiduciary responsibility rules of ERISA.

Final Regulation Relating to the Definition of Plan Assets, 29 C.F.R. Parts 2509, 2510, and 2550, 51 FR 41262-01, 1986 WL 116042 (F.R.) (Nov. 13, 1986).  The document goes on to explain how the regulation serves a number of purposes, including expanding fiduciary obligations towards participants in ERISA plans, making fiduciary protections available to smaller plans

that might use collective investment arrangements, and providing certainty as to the scope of fiduciary responsibility in light of the limitations of the ERISA statute and legislative history. Id.  The document says nothing about the regulation as a means to redefine plan participants' property ownership rights writ large.

In an advisory opinion, the DOL has confirmed its opinion that the plan asset regulation does not apply to property ownership as a matter of general commercial law.  The advisory opinion states:

> The question of whether the employer or the beneficiaries of the termination annuity contract are the actual owners of the demutualization proceeds received by the employer as the named policyholder of the annuity is not within the jurisdiction of the Department of Labor under Title I of ERISA.  Rather, this issue is governed by the terms of the contract and applicable state law.

Advisory Opinion to Alden J. Bianchi, Opinion No. 2003-05A, 2003 WL 1901900 (E.R.I.S.A) (Dep't of Labor Apr. 10, 2003), at 3.  In situations "outside the scope of the plan assets regulation," the DOL posits that "the assets of a plan are generally identified on the basis of ordinary notions of property rights under non-ERISA law."  Advisory Opinion to Mr. Bruce Cooper, Opinion No. 2011-10A, (Dep't of Labor Dec. 16, 2011) (available

at www.dol.gov/ebsa/regs/aos/ao2011-10a.html).[5]  For the reasons
discussed above, the Plan Claimants' property interest in assets
invested with BLMIC is clearly "outside the scope of the plan
assets regulation."  Ordinary notions of property law therefore
apply.

          b.  Preemption

     Notwithstanding the foregoing, the Plan Claimants argue
that the plan assets provision of ERISA preempts state property
law and grants them an ownership interest in funds that were
invested with BLMIS.  This argument is incorrect.[6]  The starting
presumption when reading any statute is that Congress did not
intend to supplant state law.  New York State Conference of Blue
Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645,
654 (1995).  ERISA's preemption provision, however, is by all
accounts expansive.  See Aetna Health Inc. v. Davila, 542 U.S.

---

[5] Moreover, under claimants' reading of the law, plan
participants' ownership rights in an entity's assets would come
into and out of existence whenever equity participation among
ERISA plans crossed the 25% threshold.  For the entity to take
part in even the simplest of transactions, such as selling a
portion of the entities' assets, would require a complex
determination of ownership rights.  It would be extremely
difficult for third parties to deal effectively with such an
entity, or have confidence that they could obtain good title
from it in any sale.  Congress could not have intended such an
absurd result.  See United States v. Dauray, 215 F.3d 257, 264
(2d Cir. 2000) (courts must interpret statutes to prevent absurd
results).

[6] The Plan Claimants present no argument in favor of preempting
foreign law, which applies to ownership rights with respect to
at least one Account-Holder Entity.

200, 208 (2004).  Under this provision as relevant here, ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C.A. § 1144.  A law "relate[s] to" an employee benefit plan "if it [1] has a connection with or [2] reference to such a plan."  California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc., 519 U.S. 316, 324 (1997) (citation omitted).

It goes without saying that the relevant black letter property law at issue contains no "reference to" an employee benefit plan.  Determining whether a state law has a "connection with" such a plan, however, requires looking both "to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans."  Id. at 325 (citation omitted).

Congress enacted ERISA to "protect . . . the interests of participants in employee benefit plans and their beneficiaries" by setting out substantive regulatory requirements for employee benefit plans and to "provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts."  29 U.S.C. § 1001(b).  "The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans."  Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004).

Pre-emption does not occur "if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability." New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 661 (1995).  On the other hand, "state laws that would tend to control or supersede central ERISA functions -- such as state laws affecting the determination of eligibility for benefits, amounts of benefits, or means of securing unpaid benefits -- have typically been found to be preempted." Hattem v. Schwarzenegger, 449 F.3d 423, 431 (2d Cir. 2006) (citation omitted).

The state property laws at issue in this motion are quintessential laws of general applicability.  These laws have only the most tenuous, remote, and peripheral connection with ERISA-regulated plans.  They do not control or supersede any central ERISA function like eligibility for benefits, amounts of benefits, or means of securing unpaid benefits.  Nor do they impede the objectives of the ERISA statute: the Plan Claimants may bring a private damages action against those responsible for their plan's involvement in BLMIS.  See, e.g., In re J.P. Jeanneret Assocs., 769 F. Supp. 2d 340 (S.D.N.Y. 2011) (derivative suit by plan investors in Income Plus).

The Plan Claimants cite to a number of cases in support of their preemption argument, all of which are inapposite.  These

cases either do not address the plan assets rule at all, see
Bank of New York v. Janowick, 470 F.3d 264 (6th Cir. 2006), or
address it in the context of determining an individual's
fiduciary status, not property ownership.  See Sec'y of Labor v.
Doyle, 675 F.3d 187, 200 (3d Cir. 2012); Kalda v. Sioux Valley
Physician Partners, Inc., 481 F.3d 639, 643 (8th Cir. 2007).

   The Plan Claimants variously argue that they have a
contractual property interest in the underlying assets invested
with BLMIS in light of certain provisions in their respective
offering documents.  The portions of the offering documents
cited, however, simply refer to the plan assets regulation in
the context of determining fiduciary status, not ownership of
company assets.  The Construction Plan Claimants also note that
Income Plus is not an LLC but a group trust under the Internal
Revenue Code, Revenue Ruling 81-100.  This provision of the
Internal Revenue Code simply addresses a group trust's tax
exempt status, however, not property ownership rights.  See
1981-1 C.B. 326. Rev. Ru. 2004-67, 2004-28 I.R.B. 28.

B.   Relevant Case Law

   Morgan, Kennedy, the leading Second Circuit case
interpreting SIPA's definition of "customer," denied customer
status to employee-beneficiaries of a trust created under a
profit-sharing plan.  Morgan, Kennedy held that it was the trust

28

itself that qualified for customer status, not the employee-beneficiaries.  Morgan, Kennedy, 533 F.2d at 1318.

The employee-beneficiaries in Morgan, Kennedy shared many characteristics of the ERISA Claimants.  Like the ERISA Claimants, the employee-beneficiaries in Morgan, Kennedy did not hold title to any assets invested with the debtor; in Morgan, Kennedy, title to these assets was held by three trustees.  Like the ERISA Claimants, none of the Morgan, Kennedy employee-beneficiaries had an account in his or her name with the debtor or a name that appeared on the debtor's books or records; rather, the account was held in the trustees' names.  In addition, in Morgan, Kennedy control over investment decisions "was exercised solely by the Trustees, who communicated regularly with the debtor with respect to all transactions."  Id. at 1315.

Morgan, Kennedy points to a number of factors as indicative of "customer" status.  These include:

- Being an investor or trader;

- Making "the decision to entrust [one's] funds" to the broker-dealer;

- Having standing to give "buy or sell order[s] in the account";

- Having a "financial relationship" with the broker-dealer;

- Having "exclusive power to entrust the assets to the [boker-dealer], to invest and reinvest, and to purchase and trade securities in the account";

- Having "repeated business dealings" with the broker-dealer;

- Making purchases with, transacting business with, and having dealings with by the broker-dealer;

- Owning property held by the broker-dealer;

- Being known by the broker-dealer (i.e., not being "complete[ly] anonym[ous]"); and

- Having "a capacity to have dealings with" the broker-dealer;

Id. at 1318.  Applying these factors, the court determined that it was the single trust account, not the multiple employee-beneficiaries, which "possessed the required attributes for customer status under SIPA."  Id.  The employees themselves "possessed none of those attributes," and granting them customer status would "stretch[] that term wholly beyond its limits." Id.

      An application of the Morgan, Kennedy factors to the facts of this motion dictates an identical result.  It was the Account-Holder Entities, not the ERISA Claimants, that had accounts in their names with BLMIS; that appeared on BLMIS's books and records; that entrusted funds to BLMIS; that had capacity to give buy or sell orders in their accounts; that had power to entrust the assets to BLMIS, to invest and reinvest,

and to purchase and trade securities in their accounts; that had
repeated business dealings with BLMIS; that made purchases with,
transacted business with, and had dealings with BLMIS; that
owned property held by BLMIS; and that, principally, were known
by BLMIS.  Overall, these factors strongly suggest that it is
the Account-Holder Entities, not the ERISA Claimants, that
"possessed the required attributes for customer status under
SIPA."[7]  Id.

The ERISA Claimants variously argue that, by virtue of
ERISA, they had a fiduciary relationship with BLMIS and that
they therefore had some capacity to have dealings with and
exercise control over BLMIS.  They note that fiduciary duties
established pursuant to ERISA are the "highest known to the
law."  Donovan v. Bierwirth, 680 F.2d 263, 271 n.8 (2d Cir.
1982).  Even if these claimants had a fiduciary relationship
with BLMIS, however, this is relevant to only a few of the
factors in Morgan, Kennedy.  Without an account in his or her
name with BLMIS or title to any assets with BLMIS, a claimant
cannot achieve customer status merely by virtue of having a

---

[7] It is noteworthy that an alternative conclusion could create
problems with the SIPA distribution scheme.  If both the
Account-Holder Entities and the ERISA Claimants qualify as
customers, then SIPC must distribute an advance to each on the
basis of their respective "net equities."  15 U.S.C. §§ 78fff-
2(b).  It is unclear how such a distribution would operate in
practice where certain customers' "net equities" are based on
the same underlying assets.

fiduciary relationship with the debtor.  The ERISA Claimants
fail to cite to any authority in which customer status was
granted to any such claimant.

A number of Individual Claimants attempt to distinguish the
employer-funded profit plan in Morgan, Kennedy from the plans in
which they invested.  They variously note that unlike the
employee-beneficiaries in Morgan, Kennedy, they contributed
their own money to their plan, they could control the size of
their investment, they could withdraw from or roll over money
into their plan, their plan kept track of the precise value of
their investments, they were known to BLMIS due to reporting
requirements associated with BLMIS's status as a fiduciary, they
received statements reflecting the value of their investments,
they had actual contact with BLMIS, and they could choose among
multiple alternative investments when directing the plan to
invest their share of plan assets.

To the extent these distinctions result from ERISA law, as
opposed to the particular factual situation of any particular
claimant, they do not alter claimants' customer status.  The
fact that Individual Claimants participated in defined
contribution plans, to which they could contribute their own
money, does not change the fact that title to this money passed
to their plan when they made such contributions.  Participants'
ability to control the size of their investments, withdrawals,

and rollover funds, and to choose among a limited set of
investment alternatives is not equivalent to having a direct
financial relationship with or directly entrusting one's own
funds to a broker-dealer, or exercising sole control over
investment decisions.  Nor is any awareness of or contact with
the claimants on the part of BLMIS equivalent to the kind of
"repeated business dealings" associated with customer status.
Morgan, Kennedy, 533 F.2d at 1318 (citation omitted).

The Construction Plan Claimants contend that they are
investors or traders and therefore the kind of "public
investor[s]" SIPA was designed to protect.  The Construction
Plan Claimants further argue that the accounts with BLMIS were,
in fact, their accounts because they were established by the
Account-Holder Entities in a fiduciary capacity, funded by cash
owned by the ERISA Claimants, and held in trust for the
claimants.  They note that pursuant to DOL regulations, the
assets of the Construction Plans were held in trust for them
even if held "in the name of a nominee or in a street name."  29
C.F.R. § 2550.403a-1(a)-(b).

The Construction Plan Claimants did not, in fact, have
accounts with BLMIS.  The relevant accounts were held in the
name of the Account-Holder Entities, not the Construction Plan
Claimants.  Likewise, title to the assets in these accounts was
held by the Account-Holder Entities, not the Construction Plan

33

Claimants.  This is the case regardless of whether or not such title was held in trust "in the name of a nominee or in a street name" pursuant to 29 C.F.R. § 2550.403a-1(a)-(b).  As such, the Construction Plan Claimants did not themselves invest in BLMIS and they are not the kind of "public investor" SIPA was designed to protect.  Rather, it was the Account-Holder Entities that invested with BLMIS, and these are the entities that merit the protection of SIPA customer status.

A number of Individual Claimants cite to In re Waddell Jenmar Sec., Inc., 126 B.R. 935 (Bankr. E.D.N.C. 1991), aff'd sub nom. Waddell Jenmar Sec., Inc., In re, 991 F.2d 792 (4th Cir. 1993), for the proposition that individual participants in a defined contribution retirement plan can attain customer status under SIPA even if their checks were made payable to a plan administrator rather than to the broker-dealer, as long as their assets were actually deposited with a broker-dealer.  See id. at 939-40.  In fact, the court in Waddell explicitly declined to reach that issue.  It opted not to determine whether each individual pension plan participant, or only the plan itself, qualified as a customer because this issue "would only be relevant if the aggregate allowed claims exceeded the SIPC claims limit," which they did not.  Id. at 944 n.9.

34

C.   Having an Account With the Debtor

The ERISA Claimants cite to cases that they claim indicate it is not necessary to have an account in one's name or to appear in the debtor's books in order to qualify for customer status.  See, e.g., In re Stalvey & Assocs., Inc., 750 F.2d 464, 470 (5th Cir. 1985); S.E.C. v. Ambassador Church Fin./Dev. Group, Inc., 679 F.2d 608, 614 (6th Cir. 1982); Sec. Inv. Prot. Corp., 454 B.R. at 287.  They contend that these are but two among many factors in Morgan, Kennedy, and note that SIPA's third definition of "customer" includes no mention of a securities account.  They further argue that SIPA's legislative history indicates that Congress did not intend to include an account-holding requirement in SIPA's definition of "customer."  An early draft of legislation imposed such a requirement, but it was later removed.

Regardless of whether it is necessary to have an account with the debtor in order to qualify as a customer under SIPA, the ERISA Claimants cannot prevail on this motion.  This is not a case where the claimants fulfilled indicia of customer status except those associated with having an account with the debtor.  These claimants also failed to hold title to any assets deposited with BLMIS.  They therefore could not "deposit[] cash with the debtor for the purpose of purchasing securities," 15 U.S.C. § 78lll(2), and do not fulfill the majority of the

35

Morgan, Kennedy factors addressed above.  Moreover, the only cases in which a claimant was determined to be a customer despite not holding an account with the debtor involved situations in which a customer account should have been opened for the claimant but for misfeasance of the broker-dealer or its agents.  See In re Primeline, 295 F.3d at 1107; In re Old Naples, 223 F.3d at 1301; S.E.C. v. Ambassador Church, 679 F.2d at 614; cf. Oppenheimer & Co., Inc. v. Neidhart, 56 F.3d 352, 357 (2d Cir. 1995) (reaching a similar conclusion while interpreting Section 12(a) of the National Association of Securities Dealer code as opposed to SIPA).  No such misfeasance is alleged by any claimant in these cases.  It is also worth noting that the removal of an explicit account-holding requirement from an early draft of SIPA can be explained by Congress's desire to include an exception for customers of brokers, dealers, or banks.  See 15 U.S.C. § 78fff-3(a)(5).  But regardless, the combination of the ERISA Claimants' lack of title to assets deposited with BLMIS, failure to have accounts with BLMIS (or to allege that they should have had such accounts absent misfeasance by the debtor or its agent), and failure to be named in BLMIS's books is, in these cases, fatal to their claims.

D.   Exceptions to the Customer Requirements

ERISA has exceptions to the customer requirements of SIPA § 78lll(2), but the ERISA Claimants do not fit within them. SIPA § 78fff-3(a)(5) grants customer status to customers of banks, brokers, or dealers that do not qualify for such status under the customer definition in § 78lll(2).  Pursuant to SIPA § 78fff3(a)(5), when the net equity claim of a broker, dealer, or bank against the debtor arose out of transactions for customers of the broker, dealer, or bank, each customer of the broker, dealer, or bank "shall be deemed a separate customer of the debtor."  15 U.S.C. § 78fff-3(a)(5).  The broker, dealer, or bank itself is not eligible to receive the benefits of "customer" status.  Id.

The Plan Claimants are not, and do not claim to be brokers, dealers or banks within the meaning of § 78fff3(a)(5).  Instead, the Construction Plan Claimants argue that this exception applies whenever a fiduciary opens an account on a customer's behalf, and that they fit within it because the Account-Holding Entities were their fiduciaries and agents.  This interpretation of the statute contradicts its plain meaning, and would improperly read into SIPA an exception that Congress did not provide.  See United States v. Johnson, 529 U.S. 53, 58 ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others.  The proper

inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth."). The Construction Plan Claimants present no authority contrary to this conclusion.

## CONCLUSION

The Trustee's October 5, 2011 motion for an order affirming the Trustee's determinations denying claims over ERISA-related objections is granted. The Clerk of Court shall close the above-captioned cases.

SO ORDERED

Dated:    New York, New York
          July 25, 2012

_____
         DENISE COTE
United States District Judge

38